UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
                                                                :
CHRIS TERRY,                                                     :
                                                                :
                              Plaintiff,                         :
                                                                :
                -against-                                        :
                                                                :
THE CITY OF NEW YORK; FRANK RYAN:                               :        Index No. 23-CV-5955 (NRM)(JRC)
and JOHN/JANE DOES, Nos. 1-10 (Members                          :
of the New York City Department of Correction                   :
and New York City Health and Hospitals                          :
Corporation Correctional Health Services whose                  :
names are presently unknown to plaintiff),                      :
                                                                :
                              Defendants.                        :
                                                                :
-------------------------------------------------------------------x

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

ROBERT T. PERRY
rtperry32@gmail.com
509 12th Street, Suite 2C
Brooklyn, New York 11215
(347) 415-5272
*Counsel for Plaintiff*

Date of Service: July 17, 2025

## TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

     A.    Plaintiff's Section 1983 Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     B.    The "General Release" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

     I.    APPLYING THE SECOND CIRCUIT'S MULTI-FACTOR TEST FOR
             DETERMINING WHETHER A PLAINTIFF, IN EXECUTING A
             RELEASE, KNOWINGLY AND VOLUNTARILY WAIVED RIGHTS
             UNDER FEDERAL EMPLOYMENT DISCRIMINATION LAWS,
             THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO
             WHETHER OR NOT PLAINTIFF KNOWINGLY AND
             VOLUNTARILY WAIVED HIS EXCESSIVE FORCE CLAIM
             UNDER 42 U.S.C. § 1983. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

           A.    The Multi-Factor Test for Determining Whether a Plaintiff
                Knowingly and Voluntarily Waived Rights Under Federal
                Employment Discrimination Laws . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

           B.    The Multi-Factor Test Should Apply to Determine Whether a
                Plaintiff, In Executing a Release, Knowingly and Voluntarily
                Waived Constitutional Claims Under 42 U.S.C. §1983. . . . . . . . . . . . . . .10

           C.    Applying the Multi-Factor Test Here, There Is a Genuine Issue
                of Material Fact as to Whether or Not Plaintiff Knowingly and
                Voluntarily Waived His Excessive Claim Under 42 U.S.C. §1983. . . . . . .12

                1.    Plaintiff's Education and Business Experience. . . . . . . . . . . . . . .13

                2.    The Amount of Time That Plaintiff Had Possession of the
                     Agreement Before Signing It. . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

3.     The Role of Plaintiff in Deciding the Terms of the
       Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

4.     The Clarity of the Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . 14

5.     Whether Plaintiff Was Represented by or Consulted
       With an Attorney. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

6.     Whether the Consideration Given in Exchange for the Waiver
       Exceeds Benefits to Which the Plaintiff Was Already Entitled
       to by Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

7.     Whether Plaintiff Had a Fair Opportunity to Consult an
       Attorney. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

8.     Other Factors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

9.     The Totality of the Circumstances. . . . . . . . . . . . . . . . . . . . . . . . .20

II.    APPLYING GENERAL PRINCIPLES OF CONTRACT LAW IN NEW
       YORK, THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO
       WHETHER OR NOT PLAINTIFF KNOWINGLY AND VOLUNTARILY
       WAIVED HIS EXCESSIVE FORCE CLAIM UNDER 42 U.S.C. §1983. . . . . . .21

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

<u>Federal Cases</u>

*Ali v. City of New York*, No. 20 Civ. 00030, 2021 U.S. Dist. LEXIS 2555741
(E.D.N.Y. Sept. 29, 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

*Amidax Trading Group v. S.W.I.F.T. SCRL*, 671 F.3d 140 (2d Cir. 2011) . . . . . . . . . . . . . . . . . . . 6

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

*Bormann v. AT&T Communications, Inc.*, 875 F.2d 399 (2d Cir.), *cert. denied*,
493 U.S. 924 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 8-9, 9, 10, 10-11, 20, 21

*Campbell v. Alliance Nat'l, Inc.*, 107 F. Supp.2d 234 (S.D.N.Y. 2000). . . . . . . . . . . . . . . . . . . . . .21

*Caraballo v. City of New York*, No. 24-2051-cv, 2025 WL 1430152 (2d Cir. May 19, 2025) .11, 17

*Cirillo v. Arco Chem. Co.*, 862 F.2d 448 (3rd Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Cooper v. City of New York*, No. 14 Civ. 1761, 2018 WL 5115565 (E.D.N.Y. Oct. 11, 2018) .17-18

*Coventry v. United States Steel Corp.*, 856 F.2d 514 (3d Cir. 1988). . . . . . . . . . . . . . . . . . . . .8, 10

*Dakheem Miller v. City of New York*, No. 21 Civ. 02616, Transcript of Proceedings
Before the Honorable Jennifer E. Willis, United States Magistrate Judge
(Sept. 26, 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

*Drees v. County of Suffolk*, No. 06-CV-3298, 2009 WL 8755530 (E.D.N.Y.
Mar. 30, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 19, 20, 21

*Edwards v. City of New York*, No. 18 Civ. 8282, 2020 WL 5503538 (S.D.N.Y. Sept. 11, 2020) . .17

*EEOC v. American Ex. Pub. Corp.*, 681 F. Supp. 216 (S.D.N.Y. 1988). . . . . . . . . . . . . . . . 8, 9, 14

*Felder v. Casey*, 487 U.S. 131 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

*Fischl. v. Armitage*, 128 F.3d 50 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

*G-I Holdings, Inc. v. Baron & Budd*, 238 F. Supp.2d 521 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . 6

*Glugover v. Coca-Cola Bottling Co. of N.Y., Inc.*, No. 91 Civ. 6331, 1993 WL 312269
(S.D.N.Y. Aug. 12, 1993), *aff'd*, 60 F.3d 810 (2d Cir. 1995) . . . . . . . . . 8-9, 11, 13, 14, 21

*Graham v. Connor*, 490 U.S. 386 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

*Krijn v. Pogue Simon Real Estate Co.*, 896 F.2d 687 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . .6

*Kristoferson v. Otis Spunkmeyer, Inc.*, 965 F. Supp. 545 (S.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . 9

*Laniok v. Advisory Comm. of Brainerd Mfg. Co. Pension Plan*, 935 F.2d 1360
   (2d Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9, 9-10, 19, 20

*Lloyd v. City of New York*, No. 15 Civ. 8539, 2017 WL 2266876 (S.D.N.Y. May 22, 2017) . . . . .12

*Mandavia v. Columbia Univ.*, 912 F. Supp.2d 119 (S.D.N.Y. 2012), *aff'd*,
   556 Fed. App'x. 56 (2d Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 18

*Mateo v. Carinha*, No. 14 Civ. 9020, 2019 WL 1409727 (S.D.N.Y. Mar. 28, 2019) . 11, 11-12, 12,
   17

*McCann v. Coughlin*, 698 F.2d 112 (2d Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

*McKinley v. Crevatas*, No. 20 Civ. 3606, 2022 WL 2066195 (S.D.N.Y. June 8, 2022) . . . . . . . . .17

*Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292 (2d Cir.), *cert. denied*,
   540 U.S. 823 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Okoro v. Marriott Int'l, Inc.*, No. 07 Civ. 165, 2007 WL 980429 (S.D.N.Y. Apr. 3, 2007) . 9, 20-21

*Peralta v. City of New York*, No. 19 Civ. 7565, 2022 WL 17832324 (S.D.N.Y. Dec. 21, 2022) . . 17

*Phelps v. Geico Indemnity Co.*, No. 6:12-CV-1585, 2015 WL 1447024 (N.D.N.Y.
   Mar. 30, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

*Polizzi v. United States*, 926 F.3d 1311 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

*Pucilowski v. Spotify USA, Inc.*, No. 21 Civ. 1653, 2022 WL 836797 (S.D.N.Y.
   Mar. 21, 2022), *aff'd*, 2022 WL 16842926 (2d Cir. Nov. 10, 2022). . . . . . . . . . . . . . . . . .9

*Rodriguez v. City of New York*, 72 F.3d 1051 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

*Seiden Associates, Inc. v. ANC Holdings, Inc.*, 959 F.2d 425 (2d Cir. 1992). . . . . . . . . . . . . . . . .11

*Tung v. Texaco Inc.*, 150 F.3d 206 (2d Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

*United States v. Local 1804-1*, 44 F.3d 1091 (2d Cir. 1995) ). . . . . . . . . . . . . . . . . . . . . . . . . . .11

*United Transp. Union v. National R.R. Passenger Corp.*, 588 F.3d 805 (2d Cir. 2009) . . . . . . . . 7

*VeroBlue Farms USA Inc. v. Canaccord Genuity LLC*, No. 20 Civ. 4394, 2021 WL 3913555 (S.D.N.Y. Sept. 1, 2021), *aff'd*, 2022 WL 2133780 (2d Cir. June 14, 2022). . . . . . . . . . .25

*Villager Pond, Inc. v, Town of Darien*, 56 F.3d 375 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . .6

*Zveiter v. Brazilian Nat'l. Superintendency of Merchant Marine*, 833 F. Supp. 1089 (S.D.N.Y. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## State Cases

*Cahill v. Regan*, 5 N.Y.2d 292 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

*Chiappone v. North Shore Univ. Hosp.*, 164 A.D.3d 463 (2d Dept. 2018) . . . . . . . . . . . .22, 23, 25

*Clemente Bros. Contracting Corp. v. Hafner-Milazzo*, 23 N.Y.3d 277 (2014). . . . . . . . . . . . . 24-25

*D & W Central Station Alarm Co. v. Yep*, 126 Misc.2d 37 (Civ. Ct. Queens Cnty. 1984) . . . . . . .24

*Kaloyeros v. Research Fdn. of State Univ. of N.Y.*, 71 Misc.3d 1219(A), 144 N.Y.S.3d 557 (Table), 2021 WL 1899401 (Sup. Ct. Albany Cnty. May 6, 2021) . . . . . . . . . . . . . . . . . .25

*Mangini v. McClurg*, 24 N.Y.2d 556 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 21-22

*Seiden Associates, Inc. v. ANC Holdings, Inc.* 959 F.2d 425 (2d Cir. 1992) . . . . . . . . .15, 15-16, 16

*State v. Avco Financial Serv. of N.Y., Inc.*, 50 N.Y.2d 383 (1980) . . . . . . . . . . . . . . . . . . . . . . . 24

## Constitutions and Statutes

U.S. Const. amend. iv . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634. . . . . . . . . . . . . . . . . . . . . 8, 9, 10

Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Older Workers Benefits Protection Act, 29 U.S.C. § 626(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq*. . . . . . . . . . . . . . . . . . . . . . 9

Family Medical Leave Act, 29 U.S.C. § 2601 *et seq*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1, 3, 10, 11, 12, 21, 23-24, 24, 25

42 U.S.C. § 1988. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. . . . . . . . . . . . . . . . . . . . . . . 9

Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

**Rules**

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 6

Fed. R. Civ. P. 12(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

Fed. R. Civ. P. 56(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

**Miscellaneous**

22 NY Jur 2d Contracts § 248. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

## PRELIMINARY STATEMENT

Plaintiff Chris Terry brings this action under 42 U.S.C. §1983 ("Section 1983") against the City of New York ("the City"), Frank Ryan, formerly a City police officer, and other unidentified City employees. Defendants City and Ryan have moved to dismiss the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.") for failure to state a claim upon which relief can be granted, or, alternatively, for summary judgment under Fed. R. Civ. P. 12(d). Plaintiff has decided to withdraw all claims except for his excessive force claim against defendant Ryan under Section 1983 and the Fourth Amendment to the United States Constitution based on a January 3, 2021 incident ("plaintiff's Section 1983 claim").

In moving to dismiss plaintiff's Section 1983 claim, defendants cite a "General Release" signed by plaintiff on June 30, 2021 to settle an unrelated claim filed on his behalf by Matthew Waller, Esq., with the New York City Office of the Comptroller ("Comptroller") in early 2020 in connection with an incident in the Manhattan House of Detention in November 2019 (the "slip-and-fall-incident claim"). Defendants contend that plaintiff thereby released the City, its agents and employees, including defendant Ryan, from liability for any violations of plaintiff's civil rights occurring prior to June 30, 2021.

The motion should be denied. Applying either the Second Circuit's multi-factor test for determining whether a plaintiff, in executing a release, knowingly and voluntarily waived rights under federal employment discrimination laws or general principles of contract law in New York, there is at least a genuine issue of material fact as to whether or not plaintiff, in signing the "General Release" to settle his slip-and-fall-incident claim, knowingly and voluntarily waived his Section 1983 claim.

## STATEMENT OF FACTS

**A.    Plaintiff's Section 1983 Claim**

On January 3, 2021, plaintiff was driving his vehicle in the vicinity of 11th Street and 34th Avenue in Queens County when stopped by police officers. Compl. ¶ 14. As plaintiff pulled over to the right side of the road, one police car driven by defendant Ryan pulled up in front of plaintiff's vehicle and another police car pulled up behind plaintiff's vehicle, boxing in plaintiff's vehicle. Compl. ¶ 15. An officer exited the police car behind plaintiff's vehicle, drew his gun, walked up to plaintiff's vehicle and opened the door to the vehicle. Compl. ¶ 16. Fearing that he was about to be assaulted by an officer, plaintiff closed the door, put his vehicle in reverse, pulled out and drove off. Compl. ¶ 17.

Defendant Ryan drove after plaintiff, following plaintiff to Vernon Boulevard and 44th Road, where plaintiff's vehicle crashed into scaffolding and came to a stop. Compl. ¶ 18. Plaintiff exited his vehicle and began fleeing on foot. Compl. ¶ 19. Defendant Ryan exited his police car and ran after plaintiff. Compl. ¶ 20. Defendant Ryan caught up with plaintiff in the back of a rental truck lot, where he began assaulting plaintiff. Compl. ¶ 21. Defendant Ryan repeatedly punched and kicked plaintiff in the head and about his body. Compl. ¶ 22. Plaintiff did not provoke defendant Ryan's assault on him and offered no physical resistance that would have justified the assault. Compl. ¶¶ 23-24. Defendant Ryan used more force than was reasonably necessary to take plaintiff into custody. Compl. ¶ 25. Plaintiff eventually freed himself from defendant Ryan's grasp and ran away to avoid further assault. Compl. ¶ 26.

After escaping from defendant Ryan, plaintiff came to a private home, where he knocked on a window, pleading for help. Compl. ¶ 27. When the homeowner came to the window, plaintiff stated that "the police are trying to kill me." Compl. ¶ 28. Responding to a 911 call

2

made by the homeowner, officers -- not including defendant Ryan -- came to the location and

took plaintiff into custody.  Compl. ¶ 29.

Later that night, defendant Ryan boasted to fellow officers that he "beat the fucking shit

out of" plaintiff.  Compl. ¶ 30.  Unbeknownst to defendant Ryan, the boast was recorded by

another officer's body worn camera.  Compl. ¶ 31.  None of the fellow officers present objected

to defendant Ryan's boast or even expressed surprise at the boast.  Compl. ¶ 32.

As a result of the assault by defendant Ryan on January 3, 2021, plaintiff suffered serious

physical injuries to his back, right hand, left shoulder and left ankle.  Compl. ¶¶ 33-34.  Plaintiff

also suffered emotional distress, mental anguish, shock, fright, apprehension, embarrassment and

humiliation.  Compl. ¶ 35.

Based on the above factual allegations, plaintiff asserts an excessive force claim against

defendant Ryan under Section 1983 and the Fourth Amendment to the United States

Constitution.  Compl. ¶¶ 59-62.

**B.    The "General Release"**

On November 13, 2019, while detained in the Manhattan House of Detention at 125

White Street in Manhattan, plaintiff slipped and fell on a floor in the bathroom area, suffering

physical injuries.  Declaration of Chris Terry dated April 25, 2024 ("Terry Decl.") ¶ 2.  In

January 2020, Mr. Waller filed a notice of claim with the Comptroller on plaintiff's behalf in

connection with the incident (Claim No. 2020PI003226).  Terry Decl. ¶ 3; Declaration of

Matthew Waller dated May 28, 2025 ("Waller Decl.") ¶ 2.  In late June 2021, plaintiff settled the

slip-and-fall-incident claim with the Comptroller for $3,500.  Terry Decl. ¶ 12.

In settling that claim, plaintiff signed a "General Release" on June 30, 2021.  Terry Decl.

¶ 5.  That release provided in the first paragraph that plaintiff:

3

as "RELEASOR", in consideration for the payment of $3,500.00, receipt whereof is hereby acknowledged, having received independent legal advice in this matter or having voluntarily, knowingly, and willingly waived the opportunity to seek legal advice, hereby voluntarily, knowingly, and willingly releases and forever discharges the City of New York, and all past and present officials, officers, directors, managers, administrators, employees, agents, assignees, lessees, and representatives of the City of New York, and all other individually named defendants and/or entities represented and/or indemnified by the City of New York, collectively the "RELEASEES", from any and all liability, claims, or rights of action alleging a violation of civil rights and any and all claims, causes of actions, suits, administrative proceedings, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, transactions, occurrences, agreements, promises, damages, variances, trespasses, extents, judgments, executions, and demands known or unknown, at law, in equity, or by administrative regulations, which RELEASOR, his/her heirs, distributes, devisees, legatees, executors, administrators, successors and assignees had, now has or hereafter can, shall, or may have, either directly or through subrogees or other third persons, against the RELEASEES for, upon or by reason of any matter, cause or thing whatsoever that occurred through the date of this RELEASE. This RELEASE and settlement constitutes complete payment and satisfaction for all damages and injuries, including all claims for costs, expenses, attorney's fees and disbursements. This RELEASE and settlement constitutes complete payment and satisfaction for all damages and injuries, including all claims for costs, expenses, attorney's fees and disbursements.

Declaration of Adam Karp dated April 4, 2024 ("Karp Decl.") filed in support of defendants'

motion to dismiss, Exhibit ("Ex.") A.

The "General Release" provided in the next paragraph "[i]n further consideration of the

payment set forth above" that:

RELEASOR agrees to indemnify and save harmless RELEASEE for the amount of any and all, liens, claims, litigation, actions, damages, judgments, costs, expenses, and/or compensation whatsoever, presently known or unknown, whether for property damage, bodily injury, indemnification, contribution, or for any other claim of any nature whatsoever, by any person, arising out of the occurrence(s) and/or injury(ies) alleged in the aforementioned claim.

Karp Decl., Ex. A.

Mr. Waller and plaintiff disagree as to whether or not they discussed the effects of signing

the "General Release." Mr. Waller states that he and plaintiff had such discussions; that in

4

settling an earlier claim for plaintiff with the Comptroller, he had negotiated a carve out of plaintiff's other matters; and that it is his custom and practice always to discuss the effects of signing the City's "General Release."  Waller Decl. ¶¶ 3-5.  Plaintiff states that in early January 2021, he was re-arrested and sent back to Rikers Island Correctional Facility ("Rikers"); that in late February 2021, he received a letter from Mr. Waller stating that the Comptroller had offered to settle his slip-and-fall-incident claim; that he may have spoken with Mr. Waller once briefly over the phone from Rikers about the settlement but does not recall any discussion of a "General Release"; and that because this was still "Covid time" at Rikers, Mr. Waller understandably never came to Rikers to see plaintiff.  Supplemental Declaration of Chris Terry dated May 30, 2025 ("Terry Supp. Decl.") ¶¶ 8-12.

Plaintiff further states that in late June 2021, he received the settlement paperwork from Mr. Waller with a letter asking plaintiff to sign and return the papers to Mr. Waller as soon as possible; that he signed the papers before a notary public and mailed them back to Mr. Waller the same day; that he did not carefully or closely read the settlement papers before signing them; and that he was anxious to get the settlement money as quickly as possible, so that a friend could pay some bills for him, including making partial payment on the retainer fee charged by his new private defense counsel.  Terry Supp. Decl. ¶¶ 13-14.

Mr. Waller and plaintiff both agree that they did not discuss plaintiff's Section 1983 claim.  Waller Decl. ¶¶ 6-7; Terry Supp. Decl. ¶ 15.  Plaintiff states that he did not decide to pursue that claim until August 2022, after he heard defendant Ryan admit, at a pretrial suppression hearing in plaintiff's then pending criminal case, that he used excessive force on ("beat the fucking shit" out of) plaintiff on January 3, 2021.  Terry Supp. Decl. ¶¶ 15-16. Plaintiff also states that by August 2022, it was too late to file a notice of claim with the

5

Comptroller for defendant Ryan's use of excessive force against plaintiff on January 3, 2021. Terry Supp. Decl. ¶ 17.

Plaintiff basically dropped out of school in the fourth grade, though he did attend school sporadically into the 10th grade, when he finally left school for good. Terry Supp. Decl. ¶¶ 18-19. According to his prison education records, plaintiff reads at a 6.8 level, that is, a sixth grade, eight months level. Terry Decl. ¶ 16 & Ex. A. Corrections officials at Clinton Correctional Facility ("Clinton") intend to place plaintiff in an educational program at a junior high school level. Terry Supp. Decl. ¶ 20.

The Court may take judicial notice that plaintiff has spent most of his adult life in prison and thus has little business experience. Between April 19, 2011 and January 3, 2019, plaintiff was incarcerated in New York State correctional facilities. *See* Incarcerated Lookup, Chris Terry, DIN: 11A1772, at https://nysdoccslookup.doccs.ny.gov. Plaintiff was re-arrested on January 3, 2021 and has remained incarcerated since then, first at Rikers and later in New York State correctional facilities. Compl. ¶¶ 36-38. *See also* Incarcerated Lookup, Chris Terry, DIN: 22B1003, at https://nysdoccslookup.doccs.ny.gov.

## STANDARD OF REVIEW

On a motion to dismiss under Rule 12(b)(6), all factual allegations in the complaint are accepted as true, *Krijn v. Pogue Simon Real Estate Co.*, 896 F.2d 687, 688 (2d Cir. 1990), and all inferences are drawn in favor of the plaintiff. *Amidax Trading Group v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011). "'The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *G-I Holdings, Inc. v. Baron & Budd*, 238 F. Supp.2d 521, 534 (S.D.N.Y. 2002) (quoting *Villager Pond, Inc. v, Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)).

6

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). The factual allegations pled "must be enough to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555.

Summary judgment should be granted only if the court determines that there is no genuine issue of material fact to be tried and the facts as to which there is no such issue warrant judgment as a matter of law. Fed. R. Civ. P. 56(e). The court must examine the facts in the light most favorable to the non-moving party, resolving all ambiguities and drawing all factual inferences in the non-moving party's favor. *Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995). The burden is on the moving party to show that the evidence is such that a reasonable jury could not return a verdict for the non-moving party. *United Transp. Union v. National R.R. Passenger Corp.*, 588 F.3d 805, 809 (2d Cir. 2009). "Credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not the court on a motion for summary judgment." *Fischl. v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997) (citations omitted). "Only in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery." *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 303-04 (2d Cir.) (internal quotation marks and citation omitted), *cert. denied*, 540 U.S. 823 (2003).

**ARGUMENT**

**I**

**APPLYING THE SECOND CIRCUIT'S MULTI-FACTOR TEST FOR DETERMINING WHETHER A PLAINTIFF, IN EXECUTING A RELEASE, KNOWINGLY AND VOLUNTARILY WAIVED RIGHTS UNDER FEDERAL EMPLOYMENT DISCRIMINATION LAWS, THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER OR NOT PLAINTIFF KNOWINGLY AND VOLUNTARILY WAIVED HIS EXCESSIVE FORCE CLAIM UNDER 42 U.S.C. § 1983**

**A.    The Multi-Factor Test for Determining Whether a Plaintiff Knowingly and Voluntarily Waived Rights Under Federal Employment Discrimination Laws**

In 1989 in *Bormann v. AT&T Communications, Inc.*, 875 F.2d 399 (2d Cir.), *cert. denied*, 493 U.S. 924 (1989), the Second Circuit held that a plaintiff's execution of a release waiving rights under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634 ("ADEA"), was permissible, "subject to a close evaluation of various factors that are indicia of a 'knowing' and 'willful' waiver." *Id.* at 402 (quoting *Coventry v. United States Steel Corp.*, 856 F.2d 514, 518 (3d Cir. 1988)).  The Second Circuit in *Bormann* thus followed the Third Circuit in *Coventry* in adopting a multi-factor "'totality of the circumstances'" test to determine whether a plaintiff, in executing a release, knowingly and voluntarily waived rights under the ADEA.  *Id.* at 403 (quoting *Coventry*, 856 F.2d at 524).

As did the Third Circuit in *Coventry*, 856 F.3d at 523, the Second Circuit in *Bormann* looked to six factors enumerated by Judge Lasker in *EEOC v. American Ex. Pub. Corp.*, 681 F. Supp. 216 (S.D.N.Y. 1988), for addressing the question:

> "1) the plaintiff's education and business experience, 2) the amount of time the plaintiff had possession of or access to the agreement before signing it, 3) the role of plaintiff in deciding the terms of the agreement, 4) the clarity of the agreement, 5) whether the plaintiff was represented by or consulted with an attorney, and 6) whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled by contract or law."

8

*Bormann*, 875 F.2d at 403 (quoting *EEOC v. American Ex. Pub. Corp.*, 681 F. Supp. at 219).  To

that "obviously not exhaustive" list, the Second Circuit in *Bormann* added a seventh factor:

"whether an employer encourages or discourages an employee to consult an attorney, and

whether the employee had a fair opportunity to do so." *Id.* (citing *Cirillo v. Arco Chem. Co.*, 862

F.2d 448, 454 (3rd Cir. 1988)).  The Second Circuit in *Bormann* further "stress[ed] the need to

examine carefully any situation in which an older worker bargains away the statutory right to be

free from age discrimination." *Id.*

    Since *Bormann*, courts in the Second Circuit have applied the multi-factor "totality of the

circumstances" test to determine whether a plaintiff, in executing a release, knowingly and

voluntarily waived rights under other federal employment discrimination laws. *See, e.g., Laniok*

*v. Advisory Comm. of Brainerd Mfg. Co. Pension Plan*, 935 F.2d 1360, 1367-68 (2d Cir. 1991)

(Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.*); *Kristoferson v. Otis*

*Spunkmeyer, Inc.*, 965 F. Supp. 545, 546-47 (S.D.N.Y. 1997) (Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 2000e *et seq.*); *Okoro v. Marriott Int'l, Inc.*, No. 07 Civ. 165, 2007 WL

980429, at *1-2 (S.D.N.Y. Apr. 3, 2007) (Americans with Disabilities Act, 42 U.S.C. § 12101 *et*

*seq.*); *Pucilowski v. Spotify USA, Inc.*, No. 21 Civ. 1653, 2022 WL 836797, at *1, 4 (S.D.N.Y.

Mar. 21, 2022), *aff'd*, 2022 WL 16842926 (2d Cir. Nov. 10, 2022) (Family Medical Leave Act,

29 U.S.C. § 2601 *et seq.*).[1]

    Revisiting the multi-factor "totality of the circumstances" test in 1991, the Second Circuit

in *Laniok* "emphasize[d] that any attempt to establish a checklist of all applicable factors or to

insist on rigid adherence to such a list is foreclosed by the very nature if the inquiry," explaining

---

[1] Although the multi-factor "totality of the circumstances" test originated in *Bormann*, a case involving a
release waiving rights under the ADEA, the analysis of waivers of ADEA rights is now governed by
statute. *See* Older Workers Benefits Protection Act, 29 U.S.C. § 626(f); *Tung v. Texaco Inc.*, 150 F.3d
206, 208-09 (2d Cir. 1998).

that "[t]he essential question is a pragmatic one: whether, in the totality of the circumstances, the individual's waiver of his rights can be characterized as 'knowing and voluntary.'" 935 F.2d at 1368.

**B.     The Multi-Factor Test Should Apply to Determine Whether a Plaintiff, in Executing a Release, Knowingly and Voluntarily Waived Constitutional Claims Under 42 U.S.C. § 1983**

In adopting the multi-factor "totality of circumstances" test to determine whether a plaintiff, in executing a release, knowingly and voluntarily waived rights under the ADEA, the Second Circuit in *Bormann* reasoned that the test was "consistent with the strong congressional purpose underlying the ADEA to eradicate discrimination in employment." 875 F.2d at 403 (underline added). The Third Circuit in *Coventry* had previously reached the same conclusion: "In light of the strong policy concerns to eradicate discrimination in employment, a review of the totality of the circumstances, considerate of the particular individual who has executed the release, is also necessary." *Coventry*, 856 F.2d at 522-23 (underline added).

A similar rationale favors extension of the multi-factor "totality of the circumstances" test to determine whether a plaintiff, in executing a release, knowingly and voluntarily waived constitutional claims under Section 1983. Section 1983's "central purpose" is "to provide compensatory relief to those deprived of their federal rights by state actors." *Felder v. Casey*, 487 U.S. 131, 141 (1988). To achieve that purpose, Congress has authorized awards of attorney's fees to prevailing parties in Section 1983 cases -- under 42 U.S.C. § 1988 -- "indicat[ing] a strong Congressional intent to encourage private enforcement of the nation's civil rights statutes . . . ." *McCann v. Coughlin*, 698 F.2d 112, 128 (2d Cir. 1983) (underline added).

Given this strong Congressional intent, there is a "need to carefully examine any situation in which" a plaintiff who has been deprived of federal constitutional rights by state actors

10

"bargains away" the right to seek redress for the deprivation under Section 1983. *Bormann*, 875 F.2d at 403. Applying the multi-factor "totality of the circumstances" test to determine whether the waiver was knowing and voluntary best serves the need for that careful examination. Absent application of the multi-factor "totality of the circumstances" test, a plaintiff may be denied the right to sue under Section 1983, even without a knowing and voluntary waiver of the claim.

In the criminal context, constitutional rights can be waived only if the waiver is "voluntary and knowing." *Polizzi v. United States*, 926 F.3d 1311, 1319 (2d Cir. 1991) (the right to be present at one's own criminal trial). The Second Circuit has suggested that the same holds true for waivers of constitutional rights in civil contexts. *See, e.g., United States v. Local 1804-1*, 44 F.3d 1091, 1098 n.4 (2d Cir. 1995) ("Ciccone does not appear to contest the principle that an individual may waive constitutional rights in a consent decree, provided that the waiver is voluntary, knowing, and intelligent."). Applying the multi-factor "totality of the circumstances" test would ensure that waivers of Section 1983 claims must be voluntary and knowing.

To plaintiff's knowledge, the Second Circuit has never addressed whether its multi-factor "totality of the circumstances" test should apply to determine whether a plaintiff, in executing a release, knowingly and voluntarily waived constitutional rights. The Second Circuit did not address the issue in *Caraballo v. City of New York*, No. 24-2051-cv, 2025 WL 1430152 (2d Cir. May 19, 2025), on which defendants rely. Defendants City of New York and Officer Ryan's Supplemental Memorandum of Law dated June 26, 2025 ("Defts. Supp. Mem.") at 2-3.

True, the district court in *Mateo v. Carinha*, No. 14 Civ. 9020, 2019 WL 1409727 (S.D.N.Y. Mar. 28, 2019), rejected Mateo's argument that the "General Release" that he signed was not knowing and voluntary, stating that: "While certain constitutional rights may not be waived unless the waiver is knowing and voluntary, as ample case law demonstrates, this

11

principle is not implicated when a plaintiff agrees to relinquish his ability to bring suit pursuant

to 42 U.S.C. § 1983." *Id.* at *4 n.4.  Defts. Supp. Mem. at 1-2.  But *Mateo* did not discuss the

multi-factor "totality of the circumstances" test, let alone explain why it was inapplicable to that

case.  The same was true in *Lloyd v. City of New York*, No. 15 Civ. 8539, 2017 WL 2266876

(S.D.N.Y. May 22, 2017), on which *Mateo* relied.  *See* 2017 WL 2266876, at *2-4.[2]

Defendants further argue that because federal employment statutes and the rights they

create are clearly defined by Congress, the Second Circuit has more latitude to interpret releases

waiving rights under those statutes.  Defts. Supp. Mem. at 3.  But defendants do not explain why

that is so.  In any event, plaintiff's constitutional right to be free from a police officer's use of

excessive force is also clearly defined.  *See Graham v. Connor*, 490 U.S. 386, 396 (1990).  The

Second Circuit thus should have the same latitude to interpret releases waiving that right.

**C.    Applying the Multi-Factor Test Here, There Is a Genuine Issue of Material Fact as to Whether or Not Plaintiff Knowingly and Voluntarily Waived His Excessive Force Claim Under 42 U.S.C. § 1983**

Applying the multi-factor "totality of the circumstances" test here, there is a genuine

issue of material fact whether plaintiff, in executing the "General Release" to settle his slip-and-

fall-incident claim, knowingly and voluntarily waived his Section 1983 claim.  Indeed, all of the

factors under the "totality of the circumstances" test strongly support plaintiff's position that

there was no knowing and voluntary waiver.

---

[2] In urging the court to apply the multi-factor "totality of the circumstances" test, Mateo merely argued that releases waiving federal employment discrimination claims were an "analogous context" without explaining why the context was analogous. *See* Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment in *Mateo v. Carinha*, No. 14 Civ. 9020, at 22, ECF Doc. 108.  On appeal to the Second Circuit, Mateo made no mention of the test in his brief. *See* Plaintiff-Appellant's Brief in *Mateo v. Carinha*, No. 19-1078, ECF Doc. 20.

1.      **Plaintiff's Education and Business Experience**

The first factor -- the plaintiff's education and business experience -- heavily weighs in

plaintiff's favor.  Plaintiff never graduated from high school and basically dropped out of school

in the fourth grade, though he attended school sporadically into the tenth grade, before finally

dropping out for good.  Moreover, according to his prison education records, plaintiff reads at a

sixth-grade level, and Clinton officials intend to place him in a junior high school level education

program.  Further, because plaintiff has spent most of his adult life in jail or prison, he has little

business experience.  Plaintiff's status under the first factor is thus closer to that of plaintiffs in

cases where the first factor was found to favor them, *see, e.g., Drees v. County of Suffolk*, No. 06-

CV-3298, 2009 WL 8755530, at *3, 6 (E.D.N.Y. Mar. 30, 2009) (although plaintiff had a GED

and 12 college course credits, worked for the Suffolk County Police Department for 17 years,

and before that worked as a Mental Hygiene Therapy Aide for 12 years, the court found that the

first factor favored her because she lacked business experience), and markedly different from

that of plaintiff in cases where the first factor was found to disfavor them.  *See, e.g., Mandavia v.*

*Columbia Univ.*, 912 F. Supp.2d 119, 130 (S.D.N.Y. 2012), *aff'd*, 556 Fed. App'x 56 (2d Cir.

2014) ("As befits a former Senior Technician in the Columbia University Department of

Microbiology & Immunology, Plaintiff has significant education and business experience.").

2.      **The Amount of Time That Plaintiff Had Possession of the Agreement Before Signing It**

The second factor -- the amount of time that plaintiff had possession of and access to the

agreement before signing it -- also heavily weighs in plaintiff's favor.  According to plaintiff,

while detained at Rikers, he received the settlement papers from Mr. Waller in the mail, signed

them before a notary public, and mailed them back to Mr. Waller the same day, leaving little

opportunity for plaintiff to contemplate and reflect on the meaning of the legal terminology in

13

those papers. *Cf. EEOC v. American Ex. Pub. Corp.*, 681 F. Supp. at 220 ("Lahey states that he

possessed the agreement for only three days. Three days while not conclusive as to

involuntariness, is sufficiently short to create a question on the subject.").

   **3.    The Role of Plaintiff in Deciding the Terms of the Agreement**

   The third factor -- the role of plaintiff in deciding the terms of the agreement -- likewise

heavily weighs in plaintiff's favor. As is clear from defendant's motion papers (*see* Karp Decl.,

Ex. A), the Comptroller's attorneys drafted the terms of the "General Release," which is printed

on Comptroller letterhead. *Cf. EEOC v. American Ex. Pub. Co.*, 681 F. Supp. at 220 ("Lahey had

no role in deciding the terms of the release."). True, in settling an earlier claim for plaintiff, Mr.

Waller negotiated a carve out of plaintiff's other matters. But plaintiff insists that, at most, he

may have spoken with Mr. Waller about the settlement of the slip-and-fall-incident claim only

once and only briefly over the phone from Rikers and does not recall discussing the "General

Release" with Mr. Waller. There is thus at least a genuine issue of material fact as to whether or

not plaintiff had an opportunity to modify its terms. *Cf. Mandavia*, 912 F. Supp.2d at 130 (Given

Plaintiff's "contradictory account of his involvement in the negotiations over the Agreement, . . .

it is not clear from the allegations that Plaintiff played an active role in shaping the terms of the

Agreement. The Court finds that this *Bormann* factor counts in Plaintiff's favor.").

   **4.    The Clarity of the Agreement**

   The fourth factor -- the clarity of the agreement -- also heavily weighs in plaintiff's favor

as the "General Release" leaves unclear whether it bars all claims that plaintiff had or may have

had against the City, its agents and employees through June 30, 2021, or only claims arising out

of the slip-and-fall incident. While the first paragraph states that "RELEASOR," in

consideration for a $3,500.00 payment, releases RELEASEES from any and all claims "for, upon

or by reason of any matter, cause or thing whatsoever that occurred through the date of this RELEASE," the next paragraph states that RELEASOR agrees to "indemnify and save harmless" RELEASEE for any and all claims "of any nature whatsoever, by any person, arising out of the occurrence(s) and/or injury(ies) alleged in the aforementioned claim." Karp Decl., Ex. A.

This case thus presents a situation like that in *Seiden Associates, Inc. v. ANC Holdings, Inc.* 959 F.2d 425 (2d Cir. 1992). Seiden had entered into a contract with ANC Holdings, Inc.'s ("ANC") predecessor Triangle to recruit a chief executive officer ("CEO") for Triangle's container business, American National Can Company ("National Can"). *Id.* at 426. The contract provided both that Seiden's fee "will be equivalent to 30% (thirty percent) of the executive's first year's earned base and incentive compensation" (the earned compensation provision) and that "[t]he final fee will be determined 12 months from the date of employ" (the final fee provision). *Id.* at 426-27. National Can not only paid Sick, the CEO hired through Seiden's recruitment efforts, $1,023,331.17 in total earnings in 1988, Sick's first year with National Can, but also on March 1, 1989, granted Sick a $1,000,000 discretionary bonus for services performed during 1988. *Id.* at 427. Even though the discretionary bonus was part of Sick's 1988 compensation and thus covered by the earned compensation provision, ANC and National Can refused to include the bonus in calculating Seiden's compensation, citing the final fee provision, which required the recruiting fee be determined "12 months from the date of [Sick's] employ," that is, by December 31, 1988. *Id.* Seiden sued for breach of contract. *Id.* The district court granted summary judgment for ANC and National Can. *Id.* The Second Circuit reversed. *Id.* at 428.

The Second Circuit first acknowledged the conflict between the earned compensation provision and the final fee provision as applied to the facts of the case: "We see two possible

15

readings -- each of which denigrates the plain meaning of the other: either the discretionary

bonus -- though indisputably earned by Sick during 1988 -- is not considered when calculating

the recruiting fee, or the recruiting fee is not finally determined as of December 11, 1988." *Id.* at

429. The Second Circuit next observed that: "[t]he fact that each provision when read separately

may be unambiguous does not necessarily mean that when read together they will be." *Id.* The

Second Circuit further noted: "No principled reason supports a conclusion that the final fee

phrase is more crucial to a reading of the contract than the earned compensation language." *Id.*

The Second Circuit thus concluded that the contract was ambiguous: "How the contracting

parties intended the two phrases to interrelate is not evident from examining only their language.

Thus, their relationship to one another is not clear." *Id.* at 430.

Similarly here, there are two possible readings of the conflicting provisions of the

"General Release," each of which denigrates the other's plain meaning. Reading the "release"

provision literally, the ""save harmless" provision becomes superfluous, because by agreeing to

release the City, its agents and employees from all claims through the date of the "General

Release," plaintiff necessarily agreed to hold the City, its agents and employees harmless from

damages arising from all such claims and not simply from damages "arising out of the

occurrence(s) and/or injury(ies) alleged in the aforementioned claim." Alternatively, reading the

"save harmless" provision literally, the City, its agents and employees are indemnified only from

damages "arising out of the occurrence(s) and/or injur(ies) alleged in the aforementioned claim,"

that is, the slip-and-fall-incident claim, leaving the City, its agents and employees subject to

potential damages arising from other claims that "any person," including plaintiff, may have

through the date of the "General Release." There is no principled reason supporting a conclusion

that the "release" provision is more crucial than the "save harmless" provision to a reading of the

"General Release."  How the contracting parties intended the two provisions to interrelate is not

evident from examining only the language in the "General Release."  The "General Release" is

thus ambiguous.

Where, as here, there is language in a release suggesting that it is limited to certain

claims, such as the words "the aforementioned claim," courts in this circuit have found the

release ambiguous.  *See, e.g., Edwards v. City of New York*, No. 18 Civ. 8282, 2020 WL

5503538, at *1, 3-5 (S.D.N.Y. Sept. 11, 2020) (General Release ambiguous where it included the

language "for, upon, or by reason of any above-stated matter, cause, or thing that occurred

through the date of this RELEASE"); *McKinley v. Crevatas*, No. 20 Civ. 3606, 2022 WL

2066195, at *2, 6 (S.D.N.Y. June 8, 2022) (General Release ambiguous where it covered "any

above-stated matter, cause or thing whatsoever that occurred through the date of this

RELEASE[.]"); *Peralta v. City of New York*, No. 19 Civ. 7565, 2022 WL 17832324, at *1-2, 4-5

(S.D.N.Y. Dec. 21, 2022) (two General Releases ambiguous where they applied to "any above-

stated matter, cause or thing whatsoever that occurred through the date of this RELEASE").

The cases on which defendants rely (Memorandum of Law in Support of Defendants'

Motion to Dismiss the Complaint dated April 5, 2024 ("Defts. Mem.") at 7-9; Defts. Supp. Mem.

at 2-3) are factually inapposite.  There was no "save harmless" provision in the General Releases

litigated in *Mateo* or *Caraballo*, let alone a "save harmless" provision comparable to that in the

"General Release" here.  *See Mateo v. Carinha*, Case No. 1901078, Doc. 21, Pages 62-63

(JA057-JA058); *Caraballo v. City of New York*, No. 24-2051-cv, Dkt. Entry 19-1 (Appendix) at

A22.  Nor did the courts in *Ali v. City of New York*, No. 20 Civ. 00030, 2021 U.S. Dist. LEXIS

2555741 (E.D.N.Y. Sept. 29, 2021), and *Cooper v. City of New York*, No. 14 Civ. 1761, 2018 WL

17

5115565 (E.D.N.Y. Oct. 11, 2018), mention, let alone address, any such "save harmless" provision.

Defendants assert that the "save harmless" provision concerns only plaintiff's promise to indemnify the City for <u>future</u> costs arising from claims related to the slip-and-fall incident. Defts. Mem. at 9. But the word "future" does not appear in that provision. Literally read, the "save harmless" provision obligates RELEASOR to indemnify and save harmless RELEASEE for costs "presently known or unknown" arising from claims related to the slip-and-fall incident. Moreover, the "release" provision already implicitly includes a promise to indemnify the City, its agents and employees for future costs arising from such claims. Defendants' interpretation thus would render the "save harmless" provision redundant and superfluous.

Defendants further argue that the "release" provision and "save harmless" provision do not conflict because the former "extinguishes" the City's liability while the latter imposes "affirmative liability" on plaintiff. Defendants' Reply in Further Support of Their Motion to Dismiss the Complaint dated May 17, 2024 ("Defts. Reply Mem.") at 4. As with "future," however, the words "affirmative liability" do not appear in the "save harmless" provision.

**5.    Whether Plaintiff Was Represented by or Consulted with an Attorney**

The fifth factor -- whether plaintiff was represented by or consulted with an attorney -- also heavily weighs in plaintiff's favor. Because Mr. Waller and plaintiff disagree as to whether they discussed the effects of the "General Release," there is at least a genuine issue of material fact whether such a discussion took place. *Cf. Mandavia*, 912 F. Supp.2d at 131 ("It would be unreasonable to count Batista's guidance against Plaintiff in a case where Plaintiff independently claims that Batista -- as his union representative -- breached a legal duty of fair representation.").

18

Further, both Mr. Waller and plaintiff agree that they never discussed whether the "General Release" would bar plaintiff's Section 1983 claim.

### 6.    Whether the Consideration Given in Exchange for the Waiver Exceeds Benefits to Which the Plaintiff Was Already Entitled to by Law

The sixth factor -- whether the consideration given in exchange for the waiver exceeds benefits to which the plaintiff was already entitled as a matter of law -- also heavily weighs in plaintiff's favor.  As plaintiff observed in his declaration in opposition to the motion to dismiss, he "never would have accepted such a low amount ($3,500) to settle both [his] claim in the slip-and-fall incident and [his] claim here."  Terry Decl., ¶ 12.  Plaintiff, in effect, received "nuisance value" money to settle his slip-and-fall-incident claim and nothing of value to waive his Section 1983 claim.  *Phelps v. Geico Indemnity Co.*, No. 6:12-CV-1585, 2015 WL 1447024, at *6 (N.D.N.Y. Mar. 30, 2015) ($5,000).  *Cf. Laniok*, 935 F.3d at 1368-69 (plaintiff's contention that he did not receive anything of value in exchange for waiving his right to participate in defendant's pension plan supported plaintiff's position that the waiver was not knowing and voluntary); *Drees*, 2009 WL 875530, at *5, 6 (plaintiff's affidavit stating that she received no additional benefits for signing the releases supported her position that they were not knowing and voluntary).

### 7.    Whether Plaintiff Had a Fair Opportunity to Consult an Attorney

The seventh factor -- whether an employer encourages or discourages an employee to consult an attorney, and whether the employee had a fair opportunity to do so -- also heavily weighs in plaintiff's favor.  While plaintiff had an attorney, there is at least a genuine issue of material fact as to whether or not plaintiff had a fair opportunity to consult with Mr. Waller about the effects of the "General Release," given that plaintiff recalls that he and Mr. Waller, at most, spoke about the settlement of the slip-and-fall-incident claim only once and then only briefly

over the phone and plaintiff does not recall any discussion with Mr. Waller about the "General Release," and also given that both Mr. Waller and plaintiff agree that they never discussed plaintiff's Section 1983 claim, let alone the effects of the "General Release" on that claim.

### 8.    Other Factors

Even assuming <u>arguendo</u> that the fact that plaintiff and Mr. Waller did not discuss the effects of the "General Release" on his Section 1983 claim does not fit within any of the above *Bormann* factors, that fact remains relevant to the "pragmatic" question here, namely, "whether, in the totality of the circumstances, [plaintiff's] waiver of his [Section 1983 claim] can be characterized as 'knowing and voluntary.'" *Laniok*, 935 F.2d at 1368.

### 9.    The Totality of the Circumstances

In sum, viewing the evidence in the light most favorable to plaintiff, as the Court must do on a motion for summary judgment, there is at least a genuine issue of material fact as to whether or not each of the factors in the multi-factor "totality of the circumstances" test favor or disfavor plaintiff, thus precluding a grant of summary judgment to defendants. *Cf. Laniok*, 935 F.3d at 1369 (reversing the district court's grant of summary judgment to defendants, where plaintiff "signed the waiver form without a clear idea of what he was giving up, without receiving anything of value in exchange, without time to reflect or consult an attorney and under threat of losing his job if he refused."); *Drees*, 2009 WL 875530, at *6 (Evidence that plaintiff lacked business experience, had little time to review the releases, lacked any role in deciding on their terms, and received no additional benefits for signing the releases, "suffic[ed] to create material issues of fact regarding the application of the *Bormann* factors to preclude summary judgment on this issue."); *Okoro*, 2007 WL 980429, at *2 (denying summary judgment to defendants, in part because the parties "dispute various aspects of the circumstances surrounding the signing of the

Release."); *Zveiter v. Brazilian Nat'l. Superintendency of Merchant Marine*, 833 F. Supp. 1089,

1097 (S.D.N.Y. 1993) (although the lack of limiting language in the release and the consideration

given in exchange for it weighed in favor of a finding of voluntariness, the other *Bormann*

factors weighed against that finding, precluding grant of summary judgment to defendants);

*Glugover*, 1993 WL 312269, at *12 ("[B]y her testimony and accompanying evidence, and

reasonable inferences to be drawn therefrom, Glugover has created issues of fact concerning the

validity of the release which preclude summary judgment in Coca-Cola's favor on this issue.");

*Campbell v. Alliance Nat'l, Inc.*, 107 F. Supp.2d 234, 241 (S.D.N.Y. 2000) ("Despite the fact that

the majority of the *Bormann* factors favor a finding of a voluntary and knowing waiver, I cannot

reject Campbell's claim that she did not understand that she would be waiving her statutory

rights to bring suit by signing the Release . . . . Campbell's evidence, consisting of her sworn

affirmation as well as deposition testimony, presents a credibility issue which cannot be resolved

on summary judgment.").

## II.

### APPLYING GENERAL PRINCIPLES OF CONTRACT LAW IN NEW YORK, THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER OR NOT PLAINTIFF KNOWINGLY AND VOLUNTARILY WAIVED HIS EXCESSIVE FORCE CLAIM UNDER 42 U.S.C. § 1983

To be enforceable under New York law, "a release need only be clear, unambiguous, and

knowingly entered into." *Drees*, 2009 WL 875530, at *3 (quotation and citation omitted).

Nevertheless, the interpretation of general releases in New York are subject to special rules

"based on a realistic recognition that releases contain standardized, even ritualistic, language and

are given in circumstances where the parties are sometimes looking no further than the precise

matter in dispute that is being settled." *Mangini v. McClurg*, 24 N.Y.2d 556, 562 (1969). "[T]he

cases are [thus] many in which the release has been avoided with respect to uncontemplated transactions despite the generality of the language in the release form." *Id.* (citations omitted).

In other words, context is critical in interpreting general releases under New York law. "Although the effect of a general release, in the absence of fraud or mutual mistake, cannot be limited or curtailed, its meaning and coverage necessarily depend, as in the case of contracts generally, upon the controversy being settled and upon the purpose for which the release was actually given." *Cahill v. Regan*, 5 N.Y.2d 292, 299 (1959) (citations omitted). "Certainly, a release may not be read to cover matters which the parties did not desire or intend to dispose of." *Id.*

Thus, in *Cahill*, the New York Court of Appeals ruled that a general release executed by Roberts, owner of Malvina Can Company ("Malvina"), settling a replevin action brought by Regan, Malvina's former chief executive, to recover certain machinery, did not bar Roberts's executors from later seeking a declaratory judgment that they owned a patent obtained by Regan during the replevin action. *Id.* at 299-300. The court reasoned that "[w]hen the release[ ] w[as] executed [by Roberts,] the parties were solely concerned with settling the controversy then being litigated, the ownership of machinery in [Roberts's] possession, a subject having no relation to the invention or the patent. Indeed, not only was no patent in existence, but [Roberts] was not even aware that one had been applied for." *Id.* at 299.

Similarly, in *Chiappone v. North Shore Univ. Hosp.*, 164 A.D.3d 463 (2d Dept. 2018), the Appellate Division, Second Department ruled that a release executed by Joseph and Antonietta Chiappone on June 27, 2014, to settle a medical malpractice claim against North Shore University Hospital ("NSUH") arising from a perforated duodenum suffered by Joseph during an endoscopy in October 2009 ("Action No. 1") did not bar Antonietta from later suing NSUH for

medical malpractice and wrongful death after Joseph was again admitted to NSUH on July 5, 2013, suffered a seizure and fall there, sustaining a hip fracture that required surgery, and died of complications from the injuries ("Action No. 2"). *Id.* at 464-65. Although the release executed to settle Action No. 1 covered all claims of any kind that the Chiappones might have had against NSUH through the date of the release, *id.* at 464, the court held that NSUH failed to establish, as a matter of law, that the release was intended to preclude Antonietta "from recovering for claims that allegedly arose during and as a result of the second admission, which were not yet in dispute at the time the release was executed." *Id.* at 465 (underline added). The court explained that "[w]hile [Antonietta] may have been aware of the incident giving rise to Action No. 2 when she signed the release, any such awareness is insufficient, itself, to establish that the release was intended to cover any potential claims which were not the subject of Action No. 1." *Id.*

Applying New York's special rules on general releases, the Honorable Jennifer E. Willis, United States Magistrate Judge for the Southern District of New York, recently ruled that "general releases" signed by Rikers detainees to settle their individual claims against the City did not bar them from joining a class action challenge to solitary confinement practices. Proceedings Before the Honorable Jennifer E. Willis, United States Magistrate Judge, *Dakheem Miller v. City of New York,* No. 21 Civ. 02616 (Sept. 26, 2024), Draft Transcript ("Tr.").[3] The judge reasoned that the detainees had signed the releases unaware of the class action and under circumstances suggesting that they only intended to settle the disputes before them. Tr. at 6. She also cited the relatively low settlement amounts and the listing of the index numbers on the releases. Tr. at 7.

Turning to this case, at the time that plaintiff executed the "General Release," the parties were solely concerned with settling plaintiff's slip-and-fall-incident claim. Plaintiff's Section

---

[3] A copy of the transcript is attached as Exhibit A to plaintiff's supplemental memorandum of law.

1983 claim had no relation to that claim.  Indeed, plaintiff was not aware that he had a viable

Section 1983 claim until long after he executed the "General Release."  Plaintiff and Mr. Waller

thus did not discuss the Section 1983 claim.  In short, plaintiff's interactions with Mr. Waller

establish the context in which plaintiff signed the "General Release" settling his slip-and-fall-

incident claim and confirm that in doing so, he did not knowingly and voluntarily waive his

Section 1983 claim.  At the very least, there is a genuine issue of material fact under New York

law as to whether or not he knowingly and voluntarily waived the claim.

Plaintiff's limited reading skills are also relevant to the context.  Where one party to a

contract is completely illiterate, New York courts have declined to enforce the contract on the

grounds of "procedural unconscionability."  *See, e.g., D & W Central Station Alarm Co. v. Yep*,

126 Misc.2d 37, 40-42 (Civ. Ct. Queens Cnty. 1984) (holding parts of a contract for rental of

burglar alarm equipment unconscionable, because the defendant, an Asian business woman not

born in the United States, spoke English with difficulty and did not read English at all).  *Cf. State

v. Avco Financial Serv. of N.Y., Inc.*, 50 N.Y.2d 383, 390-91 (1980) (holding that the Attorney

General failed to present a case of "procedural unconscionability," for example, by showing "the

presence of language difficulties or illiteracy affecting [the contract's] execution or any other

reasons that would have made it unlikely that consent was freely and knowingly given.").

While plaintiff is not completely illiterate, he reads at a sixth grade level, hardly making

him a sophisticated contracting party.  The New York Court of Appeals has made clear that a

party's lack of sophistication may be a reason for declining to enforce a contractual provision:

"We stress, however, that our holding is limited to the case of a corporate entity that either is

financially <u>sophisticated</u> or has the resources to acquire professional guidance.  It could well be

unreasonable for banks to use contracts of adhesion to impose an exacting 14-day limit on

24

<u>unsophisticated</u> customers, small family businesses, or individual consumers, including, for example, the elderly, people suffering from certain disabilities, or others for whom the 14-day rule could be too unforgiving." *Clemente Bros. Contracting Corp. v. Hafner-Milazzo*, 23 N.Y.3d 277, 289 (2014) (underline added). *See also VeroBlue Farms USA Inc. v. Canaccord Genuity LLC*, No. 20 Civ. 4394, 2021 WL 3913555, at *8 (S.D.N.Y. Sept. 1, 2021) (describing *Chiappone* as a case not involving "sophisticated parties"), *aff'd*, 2022 WL 2133780 (2d Cir. June 14, 2022).

True, Mr. Waller represented plaintiff in negotiating settlement of his slip-and-fall-incident claim. But Mr. Waller was not present with plaintiff in a cell at Rikers when plaintiff received the settlement papers, executed the "General Release," and mailed the signed papers back to Mr. Waller. Mr. Waller thus could not go through the "General Release" with plaintiff -- line by line -- explaining each and every term to plaintiff, including the "release" and "save harmless" provisions. Plaintiff, who reads at a sixth-grade level, was left to himself to discern the meaning of those conflicting provisions written in standardized, ritualistic language.

Also true, the "General Release" states that plaintiff received "independent legal advice in this matter" and "has read the foregoing and fully understands it." Defts. Mem. at 10. But those recitals do not conclusively establish that plaintiff understood the "General Release" to bar his Section 1983 claim. *Cf. Kaloyeros v. Research Fdn. of State Univ. of N.Y.*, 71 Misc.3d 1219(A), 144 N.Y.S.3d 557 (Table), 2021 WL 1899401, at *11 (Sup. Ct. Albany Cnty. May 6, 2021) ("[T]he Foundation's reliance on the TMA's recitals is misplaced, as recitals 'ordinarily form no part of the real contract.'" (quoting 22 NY Jur 2d Contracts § 248)). As already noted, plaintiff was not aware that he had a viable Section 1983 claim until long after he executed the "General Release."

It is also relevant in that regard that the recitals in the "General Release" are factually wrong in at least one critical respect: whereas the "General Release," signed by plaintiff on June 30, 2021, states that "receipt" of the $3,500 payment from the Comptroller "is hereby acknowledged" (Karp Decl., Ex. A), Mr. Waller's letter to the Comptroller dated July 6, 2021, enclosing the executed settlement paperwork, asks the Comptroller to: "Kindly forward your draft of $3,500 payable to CHRIS TERRY and the Law Office of Matthew B. Waller as his attorney." Karp Decl., Ex. C. In other words, although the "General Release" recites that plaintiff had received the $3,500 payment from the Comptroller at the time that he signed the "General Release," no such payment, in fact, had yet been made. To the extent that plaintiff's receipt of the $3,500 payment was an essential prerequisite to plaintiff's execution of the "General Release," that casts further doubt on the "General Release" as a bar to plaintiff's Section 1983 claim.

## CONCLUSION

For the reasons set forth above, defendants' motion to dismiss and/or for summary judgment should be denied as to plaintiff's Section 1983 claim.[4]

Dated: Brooklyn, New York
        July 17, 2025

                                        Respectfully submitted,

                                        *Robert T. Perry*

                                        ROBERT T. PERRY
                                        rtperry32@gmail.com
                                        509 12th Street, Suite 2C
                                        Brooklyn, New York 11215
                                        (347) 415-5272
                                        *Counsel for Plaintiff*

---

[4] Because plaintiff has decided to withdraw his other claims, plaintiff does not address the arguments made by defendants in Points II and III of their memorandum of law.

26

cc:     Seamus O'Connor (via First Class Mail)
        Assistant Corporation Counsel
        Special Federal Litigation Division
        New York City Department of Law
        100 Church Street
        New York, New York 10007-2601
        *Counsel for Defendants, The City of New York*
            *and Ryan*